# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

BEYOND SYSTEMS, INC.          *
                              *
          Plaintiff           *
                              *
v.                            *          Civil No. PJM 04-686
                              *
KEYNETICS, INC., et al.       *
                              *
          Defendants          *

# O P I N I O N

## I.

Beyond Systems, Inc. ("BSI") sues Keynetics, Inc., t/a ClickBank (collectively "Keynetics"), Rackspace Ltd. and Macro Holding, Inc. (collectively "Rackspace"), and Jeffrey Mulligan t/a HighTechMarketing.com and CBmall.com (collectively "Mulligan"). [1]  BSI alleges that Defendants individually and as co-conspirators violated the Maryland Commercial Electronic Mail Act, § 14-3001 *et seq.*, of the Commercial Law Article of the Maryland Code (MCEMA).  Defendants have moved to dismiss the action on a number of grounds.  The Court GRANTS the

---

[1]      The case was removed to this Court from the Circuit Court for Montgomery County by Keynetics, which at the time of removal was the sole Defendant.  The other Defendants were added after the case arrived here.  Jurisdiction is premised on diversity of citizenship, 28 U.S.C. § 1332.

Motion of Defendants Rackspace and Macro Holding.   The Court DENIES

WITHOUT PREJUDICE the Motions of Keynetics and Mulligan and will permit BSI

to conduct discovery of jurisdictional facts as to them as hereinafter described.

## II.

In 2003, in enacting legislation to control unsolicited commercial e-mails,

commonly known as "UCE" or "spam," Congress had occasion to make certain

findings relative to the problems such e-mails pose.   According to § 7701(a) of the

Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003

(CAN-SPAM):

(1)     Electronic mail has become an extremely important and popular means of communication, relied on by millions of Americans on a daily basis for personal and commercial purposes.  Its low cost and global reach make it extremely convenient and efficient, and offer unique opportunities for the development and growth of frictionless commerce.

(2)     The convenience and efficiency of electronic mail are threatened by the extremely rapid growth in the volume of unsolicited commercial electronic mail. Unsolicited commercial electronic mail is currently estimated to account for over half of all electronic mail traffic, up from an estimated 7 percent in 2001, and the volume continues to rise.  Most of these messages are fraudulent or deceptive in one or more respects.

(3)     The receipt of unsolicited commercial electronic mail may result in costs to recipients who cannot

refuse to accept such mail and who incur costs for the storage of such mail, or for the time spent accessing, reviewing, and discarding such mail, or for both.

(4)    The receipt of a large number of unwanted messages also decreases the convenience of electronic mail and creates a risk that wanted electronic mail messages, both commercial and noncommercial, will be lost, overlooked, or discarded amidst the larger volume of unwanted messages, thus reducing the reliability and usefulness of electronic mail to the recipient.

(5)    Some commercial electronic mail contains material that many recipients may consider vulgar or pornographic in nature.

(6)    The growth in unsolicited commercial electronic mail imposes significant monetary costs on providers of Internet access services, businesses, and educational and nonprofit institutions that carry and receive such mail, as there is a finite volume of mail that such providers, businesses, and institutions can handle without further investment in infrastructure.

(7)    Many senders of unsolicited commercial electronic mail purposefully disguise the source of such mail.

(8)    Many senders of unsolicited commercial electronic mail purposefully include misleading information in the messages' subject lines in order to induce the recipients to view the messages.

(9)    While some senders of commercial electronic mail messages provide simple and reliable ways for recipients to reject (or "opt out" of) receipt of commercial electronic mail from such senders in the

future, other senders provide no such "opt-out" mechanism, or refuse to honor the requests of recipients not to receive electronic mail from such senders in the future, or both.

(10)   Many senders of bulk unsolicited commercial electronic mail use computer programs to gather large numbers of electronic mail addresses on an automated basis from Internet websites or online services where users must post their addresses in order to make full use of the website or service.

(11)   Many States have enacted legislation intended to regulate or reduce unsolicited commercial electronic mail, but these statutes impose different standards and requirements.  As a result, they do not appear to have been successful in addressing the problems associated with unsolicited commercial electronic mail, in part because, since an electronic mail address does not specify a geographic location, it can be extremely difficult for law-abiding businesses to know with which of these disparate statutes they are required to comply.

(12)   The problems associated with the rapid growth and abuse of unsolicited commercial electronic mail cannot be solved by Federal legislation alone.  The development and adoption of technological approaches and the pursuit of cooperative efforts with other countries will be necessary as well.

15 U.S.C. § 7701(a).

As Congress noted, prior to the enactment of the federal legislation a number of states, Maryland among them, had attempted to contend with the problem

of spam. [2]   Thus, in 2002 Maryland enacted MCEMA, Annotated Code of Maryland,

Commercial Law Article § 14-3001 *et seq.*, which authorizes recipients of commercial

e-mail (essentially advertisements for real property, goods or services) to sue senders

who know or should know that the recipient's e-mail address is in Maryland and who

use the domain name or e-mail address of a third person without permission or who

send a message which contains false or misleading information about the origin or

transmission path of the e-mail or in the subject line. Md. Code Ann., Com. Law § 14-

3002(b) (LexisNexis Supp 2004).  For each such e-mail, the recipient may recover the

greater of $500 or actual damages, the same measure of damages available to a third

party without whose permission its domain name or e-mail address was used.  An

interactive computer services provider (ISP) which receives such e-mail may recover

$1,000 per e-mail or actual damages, whichever is greater.  § 14-3003.

        After CAN-SPAM, Maryland also enacted a criminal anti-spam law, the

Spam Deterrence Act, which provides, *inter alia*, that a sender of essentially the same

sort of false transmission information in e-mail messages made illegal by MCEMA

may, depending on the number of messages sent within defined periods of time and

on whether the sender has been previously convicted of similar spam offenses, be

---

[2]

        *See generally* David E. Sorkin, Spam Laws-Summary of
State Spam Laws, *available at* http://spamlaws.com/state (last
revised Feb. 7, 2006) (comparing the existing state spam laws).

subject to fines as high as $25,000 and imprisonment up to 10 years.  Md. Code Ann., Crim. Law § 3-805.1 (LexisNexis Supp. 2004).

To a limited extent, federal anti-spam legislation existed prior to CAN-SPAM, since the Communications Decency Act of 1996 (CDA), 47 U.S.C. § 230, addressed certain issues relative to commercial e-mail, particularly pornography and defamation.  As will be discussed below, the CDA provides that ISP's are immune against any cause of action that would make them liable for information originating with third party users of the service.

Under CAN-SPAM, all state or local government regulation of the use of e-mail to send commercial messages is expressly preempted, except for any "statute, regulation, or rule [which] prohibits falsity or deception in any portion of a commercial electronic mail messages or information attached thereto."  15 U.S.C. § 7707(b)(1).

But CAN-SPAM itself prohibits, among other things, the transmission of false or misleading information or deceptive subject headings and requires senders

of e-mail to have valid return e-mail addresses.  15 U.S.C. § 7704(a). [3]  Accordingly,

the viability of state anti-spam legislation somewhat clouded even after CAN-SPAM.[4]

In the present case, the Court considers the extent to which an action

under MCEMA against non-resident defendants remains effective in view of the

federal legislation, as well as constitutional and other considerations.

### III.

BSI, a corporation formed under the laws of the State of Maryland, has

its principal offices in Montgomery County, Maryland.  Keynetics, Inc., trading as

ClickBank, [5] is a corporation formed under the laws of the State of Delaware, which

maintains its principal offices in Boise, Idaho.  Rackspace, Ltd., a corporation formed

under the laws of the State of Texas, maintains its principal offices in San Antonio,

Texas, and has additional data centers in Grapevine, Texas, and Herndon, Virginia.

---

[3]    Under CAN-SPAM, each message must also clearly identify that it is an advertisement, give notice of the recipient's right to opt-out from receiving messages in the future, and contain a valid physical postal address of the sender. 15 U.S.C. § 7704(a).  Violations may be enforced as "unfair or deceptive acts or practices," § 7706(a), by the Federal Trade Commission and certain other federal agencies. § 7706(b).  In addition, State Attorneys General, as well as ISPs, may bring civil suits for injunctive relief and statutory damages. § 7706(f)-(g).  Attorneys fees are also recoverable in such actions.  *Id.*

[4]    *See, e.g.,* Roger Allen Ford, Comment, *Preemption of State Spam Laws by the Federal CAN-SPAM Act*, 72 U. Chi. L. Rev. 355 (2005) (Hereinafter "Ford").

[5]    Keynetics states that ClickBank is the only service it presently offers and is not a separate legal entity.

Macro Holding, Inc., a corporation formed under the laws of the State of Delaware, has its principal offices in Texas. [6] Although the Amended Complaint does not specifically plead Mulligan's citizenship, he has affirmed in the affidavit attached to his Motion to Dismiss that he is a resident of the State of New Hampshire and that both website businesses ascribed to him in the Amended Complaint (*viz.*, CBmall.com and HighTechMarketing.com) operate in the State of New Hampshire.

BSI describes itself as an ISP which provides computer services and Internet access to multiple users.

Keynetics, trading under the name of ClickBank, operates a website offering over 10,000 digital products of various vendors, such as e-books and software programs. It claims a network of over 100,000 online marketers, known as "affiliates," who drive Internet traffic to ClickBank's website. A primary means by which the affiliates drive traffic to ClickBank is said to be bulk mail. When shoppers respond to the e-mails sent by affiliates, they are routed to ClickBank, which "makes the sale, pays the vendor, and pays the affiliate." Keynetics maintains that it has no offices or employees in Maryland, owns no property here, does not advertise here and has sent no e-mail messages of any kind to BSI.

---

[6] BSI appears satisfied with the representation by Rackspace and Macro Holding that Macro Holding wholly owns the sole general and sole limited partners of Rackspace, in consequence of which, for present purposes, Rackspace and Macro Holding should be treated as a single entity.

Rackspace, an ISP, provides essential hosting services for, *inter alia*, the e-mails sent by Keynetics, Mulligan, and/or their affiliates.  Rackspace submits that it has no office and owns no property in Maryland and that, while it has 3 employees who reside in this State, all 3 actually work at Rackspace's Herndon, Virginia data center.  Rackspace states that out of a total customer base of 6,700, only 125 are Maryland contacts, representing 1.9% of its total customer base and accounting for roughly 2.5% of its total revenue.

Mulligan is the sole proprietor of the CBmall website, which allows shoppers to browse and buy e-books and software. [7]  Like Keynetics, CBmall uses affiliates to promote itself, but routes the affiliates to ClickBank, which in turn pays the affiliates commissions for shoppers sent to it through CBmall.  Mulligan promotes ClickBank as "a product marketplace and a payment mechanism" with numerous products available and concedes that ClickBank is "a major source of his traffic."  Keynetics has endorsed CBmall as "the early pioneer of ClickBank affiliate storefronts" offering "great value to its owners."  CBmall affiliates do not need their own websites.  CBmall tells them that it does "all the hard work, ... all you need to do is send along some traffic."  Affiliates are assigned a link that contains a "unique

---

[7]      BSI makes no specific allegations as to the second of Mulligan's purported websites, HighTechMarketing.com, and Mulligan has provided no responsive information with respect to it. The Court thus limits its consideration to the CBmall website.

ClickBank I.D.," which passes throughout the CBmall site to every link a potential shopper views and finally to ClickBank when a purchase is made.  ClickBank's software recognizes the I.D. assigned by CBmall and credits the affiliate's personal account with a commission.  The implication of this model, according to BSI, is that the CBmall's affiliates should use bulk mail to promote the sales that will be executed through ClickBank.  Mulligan submits that he targets no advertising into Maryland, solicits no business here and has no property, office or bank account here.

BSI alleges that between October 1, 2002 and December 16, 2003, it received 6,202 unsolicited commercial electronic mail messages which were initiated by, or as a result of a conspiracy among the Defendants, or which were transmitted with their assistance.  All of these e-mails allegedly promoted ClickBank.  Of the total, 2,299 were allegedly transmitted through the assistance, ratification, or endorsement of Rackspace, and 51 through the assistance, ratification, or endorsement of Mulligan or his websites.

BSI contends that the e-mails were false and misleading with regard to their origin or transmission path and/or that they contained false or misleading information in the subject line.  This information, according to BSI, had the capacity tendency or effect of deceiving the recipient.  BSI has included a few examples of

such e-mails in its Amended Complaint and has made copies of all the others it received available at a given online address.

BSI further alleges that Defendants had notice of its objections to the offensive e-mails, but that they nonetheless persisted in allowing the e-mails to be sent to it. BSI does not appear to claim that Defendants actually created the e-mails, suggesting instead that they were created by Defendants' affiliates and that Defendants, in an agency relationship with one another and with their affiliates, or as co-conspirators, assisted in the transmission of the e-mails.

Keynetics maintains that it has no control over ClickBank's vendors and affiliates, that they are independent entities, neither agents nor employers. It states that, as a condition of using its services, vendors and affiliates are expressly prohibited from advertising by unsolicited commercial e-mail.

Rackspace says that, despite a search, it has been unable to find any of the other named Defendants among its customer database but that, in any event, the most that it does as web hosting service provider is to house and maintain multiple websites for many different customers. Simultaneously, and as part of its web hosting service, Rackspace also maintains direct internal connections to their servers, allowing multiple websites to function on the World Wide Web at once.

Mulligan, like Keynetics, asserts that CBmall's affiliates are independent contractors who have no agency relationship with CBmall or with him.  Indeed, Mulligan contends that by contract he expressly negates such a relationship. Moreover, the CBmall website explicitly states that "CBmall is not affiliated with Keynetics, Inc. in any way, nor does Keynetics, Inc. sponsor or approve any CBmall product."  Mulligan disavows any connection between his website and Rackspace.

IV.

All Defendants argue, pursuant to Federal Rule of Civil Procedure 12(b)(2), that the Court lacks personal jurisdiction over them.

Keynetics and Rackspace contend that MCEMA is unconstitutional because it imposes an undue burden an interstate commerce in violation of the Dormant Commerce Clause of the U.S. Constitution.

Keynetics argues that MCEMA is preempted by CAN-SPAM because third parties cannot be liable for messages sent by others.

Keynetics also argues, pursuant to Federal Rule of Civil Procedure 12(b)(6), that the Amended Complaint fails to state a claim.

Rackspace argues that MCEMA is preempted by the CDA because the Act provides a blanket immunity to ISP's such as Rackspace.

V.

A)      When a defendant files a motion to dismiss under Rule 12(b)(2) challenging the court's personal jurisdiction, the question is one for the judge and the plaintiff, as the party invoking the court's jurisdiction, bears the burden of establishing the necessary jurisdictional facts, *e.g.* the existence of minimum contacts between the defendant and the forum state. *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989). Where the jurisdictional facts are disputed, the court may either resolve the issue in a separate evidentiary hearing or defer ruling pending receipt at trial of evidence relevant to jurisdiction. *Id.* If the court rules on the basis of the motion papers alone, the plaintiff need only make a *prima facie* showing of a sufficient jurisdictional basis. *Id.* In considering the challenge, the court is obliged to construe all relevant pleading allegations in the light most favorable to plaintiff, *i.e.* most favorable to the existence of jurisdiction. *Id.*

Special considerations obtain where jurisdictional facts are "intertwined with the merits of the action." In that instance, determination of the jurisdictional issue may also determine the merits of the action. *See Data Disc, Inc. v. Systems Technology Assocs., Inc.*, 557 F.2d 1280, 1285 & n.2 (9th Cir. 1977). Accordingly, courts have held that it is "preferable that this determination be made at trial where a

plaintiff may present his case in a coherent, orderly fashion and without the risk of prejudicing his case on the merits." *Id.* at 1285 n.2.

At the same time, in appropriate cases courts may authorize limited discovery as to jurisdictional facts where the plaintiff has made a colorable showing of personal jurisdiction. *See Mylan Labs., Inc. v. Akzo, N.V.*, 2 F.3d 56, 64(4th Cir. 1993) ("[L]imited discovery may be warranted to explore jurisdictional facts in some cases. . . .")  If the plaintiff "offers only speculation or conclusory assertions about contacts within a forum state, a court is within its discretion in denying jurisdictional discovery." *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 402-03 (4th Cir. 2003).

B)   Under Federal Rule of Civil Procedure 12(b)(6), the court, in passing upon a motion to dismiss for failure to state a claim, may dismiss the claim only if it appears beyond doubt that the plaintiff can prove no set of facts that would entitle it to relief. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Labram v. Havel*, 43 F.3d 918, 920 (4th Cir. 1995).  The court must accept as true all well-pleaded factual allegations in the complaint and view them in the light most favorable to the plaintiff. *Jenkins v. McKeithen*, 395 U.S. 411, 421-22 (1969); *Finlator v. Powers*, 902 F.2d 1158, 1160 (4th Cir. 1990).  A motion to dismiss may be used to test whether a defendant has statutory immunity.  *Cf. Behrens v. Pelletier*, 516 U.S. 299 (1996)

(qualified immunity defense may be raised at both the motion to dismiss and summary judgment stages).

Documents attached to the complaint may be considered as part of the complaint for purposes of a Rule 12(b)(6) motion.  *See Jordan v. Washington Mut. Bank*, 211 F. Supp. 2d 670, 674 (D. Md. 2002).  A plaintiff may plead itself out of court by attaching exhibits inconsistent with its claims.  *See Fayetteville Investors v. Commercial Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991); *see also Sprewell v. Golden State Warriors*, 231 F.3d 520, 528 (9th Cir. 2000).

## VI.

Ordinarily the Court would begin by considering Defendants' objections to personal jurisdiction, and discuss whether the conditions for the exercise of such jurisdiction have been met.  This appears to be one of those instances, however, in which the same considerations that bear on the constitutionality of the underlying cause of action, as well as its possible preemption in whole or in part by federal law, merge with the jurisdictional question.  *See Edgar v. MITE Corp.*, 457 U.S. 624, 643 (1982); *see also MaryCLE, LLC v. First Choice Internet, Inc.*, __ A.2d __, 2006 WL 173659, at *17 (Md. Ct. Spec. App. Jan. 17, 2006).  Accordingly, the Court believes it would aid its exposition to address the questions of the constitutionality of MCEMA

and its possible preemption by federal statute before considering the jurisdictional issue.

## VII.

Keynetics argues that a number of courts have struck down state statutes or local regulations that purport to regulate Internet activity based on what is known as the Dormant Commerce Clause of the Constitution, [8] because:

1) The state statutes involved regulation of conduct that occurred outside the state;

2) The burdens that the statutes imposed on interstate commerce were deemed excessive in relation to the local benefits conferred; and

3) Internet activity constitutes commerce that "demands consistent treatment and [is] therefore susceptible to regulation only on a national level."

---

[8] The negative implication of the Commerce Clause (the Dormant Commerce Clause), U.S. Const. Art. I., § 8, cl. 3, includes a prohibition on state regulation that "discriminates against or unduly burdens interstate commerce and thereby imped[es] free private trade in the national marketplace."

*PSINet, Inc. v. Chapman*, 362 F.3d 227 (4th Cir. 2004) (quoting *General Motors Corp. v. Tracy*, 519 U.S. 278, 287 (1997) (quoting *Reeves, Inc. v. Stake*, 447 U.S. 429, 437 (1980)).

The Court considers these three arguments beginning with the third – that Internet commerce in general demands consistent treatment and should only be regulated at the national level.  This Court need not dwell on this argument.  While perhaps interesting from an academic standpoint,[9] it is clear that Congress itself, in enacting CAN-SPAM, specifically reserved to the States, as will be discussed presently, authority to regulate certain aspects of Internet activity.  So much, then, for Internet activity in general being more appropriate for exclusive national regulation.

The first argument -- that the Dormant Commerce Clause invalidates state statutes that extend regulation to out-of-state conduct -- actually incorporates two sub-arguments – (1) that the state statutes have been deemed unconstitutional in every application, which is to say facially unconstitutional or (2) that they have been deemed unconstitutional in particular instances, which is to say unconstitutional as applied.

---

[9]

*See, e.g.*, Ford, *supra*, n.4, at 371-79.

Keynetics and Rackspace do not argue that MCEMA is facially unconstitutional,[10]

only that it is unconstitutional as applied.

Keynetics ultimately relies on the second argument -- that MCEMA is

an invalid indirect regulation of interstate commerce because the burdens it imposes

on interstate commerce are excessive in relation to the local benefits it confers.  In that

regard, Keynetics cites *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970), which

established a two-fold inquiry.  "The two-fold inquiry first looks at the legitimacy of

the state's interest and secondly weighs the burden on interstate commerce in light of

the local benefit derived from the statute." *PSINet*, 362 F.3d at 240 (citing *Pike*, 397

U.S. at 142).  Keynetics suggests that "every federal court that has examined a state

law that directly regulated the Internet determined that the state law failed the *Pike*

balancing test," citing for example *Center for Democracy & Technology v. Pappert*,

337 F. Supp. 2d 606, 661 (E.D. Pa. 2004) and the cases collected therein.  It argues

that in the present case, assuming MCEMA promotes the legitimate state interest of

---

10

    In *MaryCLE*, the Maryland Court of Special Appeals found MCEMA to be "facially neutral because it applies to all e-mail advertisers, regardless of their geographic location.  It does not discriminate against out-of-state senders ... We similarly agree with the Washington court [in *Washington v. Heckel*, 143 Wash. 2d 824, 24 P.3d 404 (2001)] that MCEMA does not regulate exclusively extraterritorial conduct because its focus is not on "when or whose recipients may open the proscribed messages.  Rather, 'the Act addresses the <u>conduct of spammers in targeting [Maryland] consumers</u>.'"  2006 WL 173659, at *19 (quoting *Heckel*, 143 Wash. 2d at 839, 24 P.3d at 412 (emphasis in *MaryCLE* opinion)).  Although this Court is not bound by a state court's interpretation of federal law, *William v. Taylor*, 529 U.S. 362, 377 (2000), the Court agrees with the Court of Special Appeals that MCEMA is facially neutral.

protecting state residents against spam, the burdens it imposes on interstate commerce are excessive in relation to the local benefits.   If MCEMA is construed as BSI suggests, says Keynetics, it could be subject to liability for spam sent by third parties engaged in promotions that Keynetics is unaware of and that are directly contrary to its policy and affiliate contract.   This is a risk, Keynetics continues, that it cannot control, so that the only way it could eliminate the risk would be to abandon the affiliate business model altogether, "a chilling burden on interstate commerce that cannot be constitutionally justified."

As for the local benefits, Keynetics suggests that these are "tenuous at best."   Transmission of false and misleading unsolicited commercial e-mail into Maryland is already regulated by CAN-SPAM and Maryland criminal law.   Keynetics submits that it is unlikely that MCEMA would achieve more than these two statutes combined.   Accordingly, balanced against the local benefits, the Act imposes an extreme burden on interstate commerce as it applies to affiliate programs such as the one engaged in by Keynetics.

BSI responds that not all courts have concluded, after engaging in a *Pike* analysis, that state statutes regulating spam unduly burden interstate commerce.   It relies on *Washington v. Heckel*, 143 Wash. 2d  824, 24 P.3d 404 (2001), in which the

Supreme Court of Washington upheld a statute essentially identical to MCEMA

against a challenge based on the Dormant Commerce Clause. [11]

Since the time Defendants' motions were filed in this case, the Maryland

Court of Special Appeals, in the *MaryCLE* case, embraced the rationale of the *Heckel*

opinion in full, holding that MCEMA passes the *Pike* balancing test because the local

benefits of the statute clearly outweigh any alleged burden on interstate commerce.

*MaryCLE*, 2006 WL 173659, at *17-*19.

---

[11]

Washington's Commercial Electronic Mail Act, Chapter 19.190 provides:

(1)   No person may initiate the transmission, conspire with another to initiate the transmission, or assist the transmission, of a commercial electronic mail message from a computer located in Washington or to an electronic mail address that the sender knows, or has reason to know, is held by a Washington resident that:

(a)   Uses a third party's internet domain name without permission of the third party, or otherwise misrepresents or obscures any information in identifying the point of origin or the transmission path of a commercial electronic mail message; or

(b)   Contains false or misleading information in the subject line.

(2)   For purposes of this section, a person knows that the intended recipient of a commercial electronic mail message is a Washington resident if that information is available, upon request, from the registrant of the Internet domain name contained in the recipient's electronic mail address.

Wash. Rev. Code § 19.190.020.

"The legislative history reveals that the Maryland General Assembly modeled MCEMA on the Washington law and relied on *Heckel* when it did so . . . ." *MaryCLE*, 2006 WL 173659, at *18  (Footnote omitted).

Because *Heckel* has become the leading case in this context, it bears extended discussion.

In *Heckel*, an Oregon resident doing business as Natural Instincts, Inc., had marketed a booklet over the Internet supposedly showing how to profit from the Internet, and did so by sending out between 100,000 and 1,000,000 unsolicited e-mails per week. He used a software program to harvest e-mail addresses from various on-line sources which enabled him to direct a bulk mail message to those addresses by entering a simple command. His message was a sales pitch in favor of his booklet. The order form that could be downloaded from the messages indicated a Salem, Oregon mailing address, the forum in which Heckel was doing business. *Id.* at 827, 24 P.3d at 406.

Based on complaints from Washington State recipients of Heckel's messages that the mailings appeared to contain misleading subject lines, false or unuseable return e-mail addresses, and false or misleading transmission paths, the Attorney General of Washington sued Heckel under the State's anti-spam statute. *Id.* at 828-29, 24 P.3d at 407.

The state trial court dismissed the action, finding that the statute violated the Dormant Commerce Clause. The Washington Supreme Court, however, reversed, finding that the statute was not facially discriminatory since it applied evenhandedly

to in-state and out-of-state mailers. *Id.* at 833, 24 P.3d at 409. It also concluded that

the Act's local benefits surpassed any alleged burden on interstate commerce and

therefore survived the *Pike* balancing test. *Id.* at 837-38, 24 P.3d at 411-12.

The Washington court found that the Act protected the interests of three

groups – ISPs, actual owners of forged domain names, and e-mail users. *Id.* at 833,

24 P.3d at 409.

As for ISPs, the court cited *CompuServe, Inc. v. Cyber Promotions, Inc.*,

962 F. Supp. 1015, 1022 (S.D. Ohio 1997), which had noted that:

> [H]andling the enormous volume of mass mailings that [the
> ISP] receives places a tremendous burden on its equipment.
> Defendants' more recent practice of evading [the ISPs]
> filters by disguising the origin of their messages
> commandeers even more computer resources because [the
> ISPs] computers are forced to store undeliverable e-mail
> messages and labor in vain to return the messages to an
> address that does not exist. To the extent that defendants'
> multitudinous electronic mailings demand the disk space
> and drain the processing power of plaintiff's computer
> equipment, those resources are not available to serve [the
> ISPs] subscribers.

*Washington v. Heckel*, 143 Wash. 2d at 833, 24 P.3d at 409 (quoting *CompuServe,*

*Inc.*, 962 F. Supp. at 1022).

As for the owners of impermissibly used domain names and e-mail

addresses, the Washington court found that they also suffer economic harm, citing, for

example, the experience of the registered owner of one domain name whose computer

system was shut down for three days by 7,000 responses to a bulk mail message in which the spammer had forged an e-mail address similar to the registered owner's e-mail address into his spam's header.  *Id.* at 834, 24 P.3d at 410.

Finally, the Washington court found that deceptive spam harms individual Internet users:

> When a spammer distorts the point of origin or transmission path of the message, e-mail recipients cannot promptly and effectively respond to the message (and thereby opt out of future mailings); their efforts to respond take time, cause frustration, and compound the problems that ISPs face in delivering and storing the bulk messages. And the use of false or misleading subject lines further hampers an individual's ability to use computer time most efficiently. When spammers use subject lines "such as 'Hi There!,' 'Information Request,' and 'Your Business Records,'" it becomes "virtually impossible" to distinguish spam from legitimate personal business messages. Individuals who do not have flat-rate plans for Internet access or pay instead by the minute or hour are harmed more directly, but all Internet users (along with their ISPs) bear the cost of deceptive spam.

*Id.* at 835, 24 P.3d at 410 (citation omitted).

The court noted that the cost-shifting from deceptive spammers to business and e-mail users was like "sending junk mail with postage due or making telemarketing calls to someone's pay-per-minute cellular phone."  *Id.*  The court thus recognized that the Act served "the 'legitimate local purpose' of banning the cost-shifting inherent in the sending of deceptive spam."  *Id.*

In contrast, the court felt that the only burden the Act placed on the spammers was "the requirement of truthfulness, a requirement that does not burden commerce at all but actually 'facilitates it by eliminating fraud and deception'" *Id.* at 836, 24 P.3d at 411 (citing  Jack L. Goldsmith and Alan O. Sykes, *The Internet and the Dormant Commerce Clause*, 110 Yale L.J. 785, 819 (2001)).  In fact, said the court, spammers incur no cost in complying with the Act, whereas they do incur costs for non-compliance "because they must take steps to introduce the forged information into the header of the message." *Id.* at 837, 24 P.3d at 411.

The court rejected any suggestion that the Act created inconsistency among the States, noting that as of that time seventeen other states had passed legislation regulating unsolicited electronic solicitations and that the truthfulness requirements of the Act did not conflict with any requirements in other state statutes, even though some state statutes might include additional requirements, such as contact information, or subject lines with certain labels advising that an advertisement was involved. *Id.* at 837-38, 24 P.3d at 411-12. These were judged to be reconcilable obligations.  The court noted that "the inquiry under the dormant Commerce Clause is not whether the states have enacted different anti-spam statutes but whether those differences create compliance costs that are 'clearly excessive in relation to the putative local benefits.'" *Id.* at 838, 24 P.3d at 412 (quoting *Pike*, 397 U.S. at 142).

The court also found no "sweeping extraterritorial effect" that would outweigh the local benefits of the Act, rejecting the implication that the Act had to be construed to apply to Washington State residents even when they were out of state, which it termed "a construction that creates a jurisdictional question not at issue in [the] case." *Id.* at 839, 24 P.3d at 412.

In conclusion, the Washington court determined that "the local benefits of the Act outweigh[ed] any conceivable burdens the Act places on those sending commercial e-mail messages." *Id.* at 840, 24 P.3d at 413.

Adopting the analysis of *Heckel*, the Maryland Court of Special Appeals in *MaryCLE* pointed out how "the benefits of MCEMA clearly outweigh the burden on ... e-mail advertisers." 2006 WL 173659, at *19:

a)   As for Maryland's interest in adjudicating the matter, the court observed that:

> "MCEMA was passed largely because the financial and social burden of UCE on Maryland consumers is great. Maryland certainly has an interest in protecting its consumers, not only from the costs associated with UCE proliferation, but also from becoming the victims of fraud and schemes initiated by false and misleading e-mail. . . . Additionally, . . . the financial costs of spam and UCE are great."

*Id.* at *12.

b)    With respect to the plaintiff's interest in obtaining convenient and

effective relief, the court found that:

"Maryland is the appropriate forum. [Plaintiff] has a financial interest in recovering for the injury it allegedly suffered and has also asserted a claim for injunctive relief."

*Id.* at *13.

c)    "Regarding the interstate judicial system's interest in obtaining the most efficient resolution of controversies," the court concluded that: "because this claim is based on a Maryland state statute, the most efficient locus for the suit is Maryland itself. As we explained ... the Maryland legislature created a private cause of action to further the state's financial and social goals in reducing the number of deceptive emails sent here. The interstate judicial system has an interest in Maryland adjudicating this claim because it seeks to enforce a Maryland prohibitory statute. Maryland courts can do so most efficiently because they are familiar with the Maryland statute." [12]

*Id.*

d)    As for the burdens MCEMA imposes, "[w]hen the only burden [it] imposes is that of sending truthful and non-deceptive e-mail," that the sender considers its requirements "inconvenient and even impractical

---

[12]    The *MaryCLE* and the *Heckel* courts' findings as to the benefits of the local legislation bear a striking resemblance to the benefits Congress noted in enacting CAN-SPAM. *See* Congressional Findings in Section II, *supra*, at 2-4.

> does not mean that the statute violates the [C]ommerce [C]lause."

*Id.* at *19.

There is no need for this Court to gild the lily. The *Heckel* and *MaryCLE* opinions have said all that needs to be said about MCEMA's relative benefits and burdens and the Court is persuaded that those cases are correctly reasoned.

Were there the least doubt, the Court again observes that Congress, in enacting CAN-SPAM, expressly accorded the States the right to regulate false and misleading e-mail transmissions. 15 U.S.C. 7707(b)(1). If Congress itself was satisfied that supplementary state legislation would impose no undue burden on interstate commerce, this Court can hardly presume to tell Congress it is wrong.

One final observation is in order as to whether CAN-SPAM and Maryland's criminal anti-spam statute should suffice in lieu of MCEMA. Getting the State Attorney General to undertake an action against one or more out-of-state spammers is much easier said than done. Inevitably political judgments must be made as to how limited resources are to be marshaled. Given competing law enforcement concerns, it is clear that only so many actions may be maintained against so many suspected offenders at any one time. More particularly, it is apparent that only so many actions can proceed against so many suspected spammers – in-state or out-of-state – at any one time. Granting individual recipients of spam the right to bring

individual actions by holding out the possibility of substantial statutory damages for each transgression is a far more effective and efficient way to put the State's anti-spam policy into practice.

The Court finds that MCEMA, as it would apply in this case, would not violate the Dormant Commerce Clause.

## VIII.

Rackspace argues that, since it is an "interactive computer service provider" (ISP), [13] any attempt to hold it liable under MCEMA is preempted by CDA, the federal Communications Decency Act.  47 U.S.C. § 230.

The Court agrees.

The CDA provides:

> No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.

47 U.S.C. § 230(c)(1).

As noted in *Zeran v. America Online, Inc.*, 129 F.3d 327 (4th Cir. 1997), a leading case interpreting the statute, the purpose of this statutory immunity is in part

---

[13]      An "interactive computer service" is defined, *inter alia*, as "any information service, system or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet...." 47 U.S.C. § 230(f)(2).

"to maintain the robust nature of Internet communication and, accordingly, to keep government interference in the medium to a minimum." *Id.* at 330. "Thus, lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions – such as deciding whether to publish, withdraw, postpone, or alter content – are barred." *Id.*

The parties do not dispute that Rackspace is an ISP as defined in the CDA.

But BSI argues that the CDA only extends to cases in which ISPs are sued in connection with the transmission of defamatory messages and that defamation is not an issue in this case. Rackspace points out, however, quite correctly, that courts have extended the reach of the CDA to immunize ISPs from liability in several settings besides defamation suits. *See, e.g., Ben Ezra, Weinstein & Co. v. America Online, Inc.*, 206 F.3d 980, 986 (10th Cir. 2000) (quoting *Zeran* and applying § 230 to a negligence claim against AOL); *Perfect 10, Inc. v. CCBill, LLC*, 340 F. Supp. 2d 1077 (C.D. Cal. 2004) (applying § 230 to claim of unfair competition based on state law); *Novak v. Overture Services, Inc.*, 309 F. Supp. 2d 446 (E.D.N.Y. 2004) (applying § 230 to claim of tortious interference with prospective economic advantage); *Noah v. AOL Time Warner, Inc.*, 261 F. Supp. 2d 532, 538 (E.D. Va. 2003) (applying § 230(c) to a claim based on Title II of the Civil Rights Act of 1964

and dismissing claims for intentional infliction of emotional distress, unjust enrichment, negligence and fraud); *Schneider v. Amazon.com, Inc.*, 108 Wash. App. 454, 464-65, 31 P.3d 37, 42 (Wash. Ct. App. 2001) (noting that many courts have applied § 230(c) to breach of contract claims).

But, BSI says, Rackspace was on notice of the allegedly offensive e-mails that were sent and in that sense provided knowing assistance to the senders. Again, however, Rackspace provides a dispositive response.   Case law clearly establishes that CDA immunity applies even where an ISP knew of its customers' potentially illegal activity.   The Fourth Circuit in *Zeran* explained why.   *Zeran* involved a negligence suit brought against an ISP on the grounds that it "had a duty to remove [a] defamatory posting promptly, to notify its subscribers of the message's false nature, and to effectively screen future defamatory material."  129 F.3d at 330. The Fourth Circuit began by stating that "by its plain language, § 230 creates a federal immunity to <u>any</u> cause of action that would make service providers liable for information originating with the third party user of the service."  *Id.* (Emphasis added.)   The court noted, among other things, that "notice-based liability for interactive computer service providers would provide third parties with a no-cost means to create the basis for future lawsuits."  *Id.* at 333.  To impose liability on ISPs would place an "impossible burden" upon them, confronting them with a specter of

tort liability with every complaint they received.  *Id.*  To require ISPs to make legal determinations about their customers' activity might well lead to the termination of service, which would have a severe impact on Internet speech and commerce, a result Congress sought to avoid by enacting Section 230.  *Id.*

In the present case, BSI has not demonstrated in the slightest that the allegedly offensive e-mails it received were created or altered by Rackspace as opposed to "another information provider."  Similarly, apart from BSI's vague conclusory statements, there is not the least suggestion that Rackspace otherwise acted as an aider, abettor, or assisted a co-conspirator in any illegal conduct of the messages transmitted.

In short, it is clear that all the requisites for application of the immunity provisions of the CDA are in place as far as Rackspace is concerned.

Under the circumstances, the Court concludes that any jurisdictional discovery as to Rackspace would be an exercise in futility – a fishing expedition and a deep sea fishing expedition at that.  If BSI were permitted to go forth with discovery on the insubstantial basis it puts forth in the present case, ISPs would have to undertake the defense of lawsuits in every state that has anti-spam legislation.  The mere subjection of the ISPs to that sort of probing would shackle their operations,

burdening the Internet to an undue degree – precisely the opposite result of the policy Congress declared in CAN-SPAM.

The Court finds that any action against ISPs brought under MCEMA is preempted by CDA.

Rackspace's Motion to Dismiss will therefore be GRANTED and, to the extent that BSI seeks discovery of jurisdictional facts as to Rackspace, its Motion for Leave to File Discovery Requests as to Personal Jurisdiction will be DENIED. [14]

IX.

Although Keynetics argues that BSI's claims are preempted by CAN-SPAM, 15 U.S.C. §§ 7701-7713, it concedes that the law provides a carve-out for any state statutes, regulations or rules that "prohibit[] falsity or deception in any portion of a commercial electronic mail message or information attached thereto." 15 U.S.C. § 7707(b)(1). Accordingly, it must also concede that, insofar as a state statute is not inconsistent with CAN-SPAM, it will not be deemed pre-empted. *See, e.g., Colorado Anti-Discrimination Comm'n v. Continental Airlines*, 372 U.S. 714, 722-24 (1963) (upholding state statute barring discriminatory hiring by airlines despite essentially identical federal statute).

---

[14]    This decision moots the question of whether the Court has personal jurisdiction over Rackspace and Macro Holding.

CAN-SPAM prohibits spammers from sending deceptive or misleading information or from using deceptive subject headings, requires them to include return addresses in their transmissions, 15 U.S.C. § 7704(a), and provides for enforcement of its provisions by certain other federal agencies including the Federal Trade Commission as well as State Attorneys General. § 7706.

But it is readily apparent that MCEMA – which prohibits use of a third party's Internet domain name or electronic mail address without the permission of the third party, or which contains false or misleading information about the origin or the transmission path of the commercial electronic mail, or which contains false or misleading information in the subject line that has the capacity, tendency or effect to deceive the recipient – – is in no way inconsistent with CAN-SPAM.  At most it supplements the federal law.  It does not frustrate the goals of the federal legislation; in fact it furthers them.  Given that sort of compatibility between state and federal law, the preemption doctrine simply does not apply.  Similarly, providing a civil remedy to the individual recipient of unwanted commercial electronic mail or to a third party without whose permission its Internet domain name or electronic mail address was used, or to an ISP provider is fully in harmony with CAN-SPAM's enforcement mechanisms.

Indeed, on closer inspection Keynetics' preemption argument actually turns out to be somewhat more elliptical.  BSI, it says, has not complied with Federal Rule of Civil Procedure 9, which requires that facts constituting Keynetics's alleged "falsity and deception" under CAN-SPAM must be pled with particularity.  Failing that, says Keynetics, BSI's claim lies outside the exception to the preemption provision of CAN-SPAM and is preempted.  This, of course, is not really an argument for preemption, but simply an argument that BSI has failed to plead the elements of its alleged cause of action, a matter the Court now turns to.

## X.

BSI has pled a single cause of action against Defendants, [15] *viz.*, violation of Section 14-3002 of MCEMA.  Defendants, it says, initiated, conspired to initiate, and assisted in the initiation of the transmission to BSI of commercial electronic messages that had one or more of the following characteristics:

e)   They used a third party's Internet domain name or electronic mail address without that third party's permission;

f)   They contained false or misleading information about the origin of the transmission path; and

---

[15]

From this point forward, unless otherwise indicated, the term "Defendants" refers only to Keynetics (ClickBank) and Mulligan (CBmall.com).

g)      They contained false or misleading information in the subject line.

The information in the electronic mail messages allegedly had the capacity, tendency or effect of deceiving the recipient.

Keynetics argues that the Amended Complaint fails to plead that ClickBank initiated the e-mail messages, or that it conspired to initiate or assisted in the initiation of the messages or that it sets forth with appropriate particularity how Keynetics participated in the purported falsity and deception of the messages.

Keynetics relies heavily on the proposition that, in its argument, BSI has incorporated by reference the affidavit of Stephen Rouse, ClickBank's chief operating officer, in consequence of which BSI is bound by certain statements of that individual, including:

a)      That ClickBank does not advertise via unsolicited e-mail nor does it allow vendors or affiliates to advertise via unsolicited e-mails;

b)      That ClickBank's vendors and affiliates are independent entities and neither agents or employees of ClickBank; and

c)      That ClickBank has never sent any e-mail messages to BSI or to any entity affiliated with it.

Keynetics also takes issue with what it terms the mere assertion that ClickBank "assisted" or "conspired with" others or that some unknown "agents" sent

the allegedly unlawful e-mail messages. "These are not facts," it says, "but legal conclusions that are insufficient to state a claim."

Mulligan joins this argument, adding that the Amended Complaint lacks specific allegations as to the existence of any agency relationship between Keynetics and Mulligan or between CBmall and its affiliates.

BSI responds that Keynetics and Mulligan confuse pleading with proof; that the Amended Complaint makes the "short and plain statement" required under the Federal Rules [16] and that Defendants are fairly on notice as to its claim.

The Court begins with a few distinctions. Unlike Maryland's personal jurisdiction statute which, for an out-of-state entity to be held in, requires at a minimum that actions have been taken "by an agent," Md. Code Ann., Cts. & Jud. Proc. § 6-103(b) (LexisNexis 2002), MCEMA does not speak in terms of agency. It says only that a "person may not initiate ..., conspire ... to initiate ... or assist in the transmission" of certain commercial e-mail. Md. Code Ann., Com. Law § 14-3002(b) (LexisNexis Supp. 2004). To be sure, a "person" may do one or more of these things "by an agent," but strictly speaking the "person" need not have done so, and still may come within the literal terms of MCEMA. And at this juncture the only issue is

---

[16]

"A pleading which sets forth a claim for relief . . . shall contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief . . . ." Fed. R. Civ. P. 8(a).

whether BSI has properly pleaded a cause of action, not whether personal jurisdiction has been properly asserted. [17]

MCEMA does not define the term "initiate," but the dictionary definition is plain enough: "to begin, set going, or originate. . . ." Webster's *Encyclopedic Unabridged Dictionary* 732 (1994).

Nor does MCEMA define "conspire," but the common law obviously informs the meaning of the term. Under Maryland law, a civil conspiracy consists of (1) an agreement between two or more persons (2) to accomplish an unlawful act or to use unlawful means to accomplish an act not in itself alleged and (3) resultant damage to the plaintiff. *See Green v. Washington Suburban Sanitary Comm'n*, 259 Md. 206, 269 A.2d 815 (1970).

"Assist" is also undefined in MCEMA, but here, too, the dictionary definition is fairly straight-forward. "Assist" means "to give support, aid, or help to . . . , to give aid or help." Webster's, *supra*, at 90. Accepting these definitions of the operative term, what has BSI pled with respect to them?

Defendants are on solid ground arguing that BSI has not claimed that they "initiated" the e-mails in the sense of "beginning" them, "setting them going" or

---

[17]

The Court deals with this issue in the following section.

"originating" them.  But they also take issue with the sufficiency of BSI's assertion that they "conspired" to "initiate" or "assisted" in the transmission of the e-mails.

The Court considers this argument, taking the conspiracy and assistance allegations together.

Both concepts, of course, require an act of more than one person, but here it is clear that the multiple actors are alleged to be Defendants and their respective affiliates.  Similarly, whether conspiracy or assistance is at issue, the transmission of false and deceptive e-mails into the State is made unlawful by reason of MCEMA. [18] Furthermore, MCEMA, CAN-SPAM, and the *Heckel* and *MaryCLE* cases describe the sort of injury a recipient of spam may sustain, which is precisely the sort of injury BSI alleges it sustained in this case.  The only issue for consideration at this point is whether BSI has fairly pled that Defendants conspired with others to initiate the e-mails or otherwise assisted in their transmission.

BSI submits that the Amended Complaint is adequate in this regard, that the "who," "what" and "when" of its case are clearly set forth in its Amended Complaint. [19]

---

[18] The Court of course makes no finding at this juncture whether the e-mails were in fact false and deceptive.

[19] "The particularity requirement of Fed. R. Civ. P. 9(b) means the who, what, when, where, and how: the first paragraph of any newspaper story."  *DiLeo v. Ernst & Young*, 901 F.2d

The "who" is Keynetics (through ClickBank) and Mulligan (through CBmall).

The "what" is the transmission in excess of 6,200 commercial e-mail messages containing false or misleading information, allegedly initiated by or transmitted with the assistance of Defendants.

The "when" is defined as the period between October 1, 2002 and December 16, 2003.

The "where" is Maryland.

The "how" has been pled in detail, *e.g.*:

Among other facts pled by BSI are that ClickBank's 100,000 affiliates promote digital products at ClickBank's website where customers access ClickBank and download their products.  ClickBank, in turn, pays the vendor and the affiliate and keeps a transaction fee for itself.  At least one e-mail received by BSI offers "over $3,000 worth of blasters and tools to help in your network marketing efforts" and suggests that "(f)or more information visit us at <http://hop.clickbank.net./?mestralsmass>."  This language, says BSI, identifies to advertisers someone at ClickBank who, in connection with the type of products sold, can provide details and clearly suggests that the sender is operating in connection with ClickBank.  Another e-mail received by

---

624, 627 (7th Cir. 1990).

BSI offers, for the price of $19.95, "10 million hits to your site!  14 Safelists!  E-mail 80 MILLION recipients spam free guaranteed...."  This, too, contains a link to ClickBank in connection with the type of products sold by ClickBank and suggests that the sender is operating in connection with ClickBank.

BSI then cites the contract that ClickBank has with its affiliates:

6.   If you promote products listed by ClickBank, then:

-   You agree to make no such promotions that suggest or imply any warranty or other policy that might conflict with ClickBank's 90 day return policy . ...

7.   If you send (or cause to be sent) messages by electronic means (including but not limited to email, and instant messages) in connection with the direct or indirect promotion of ClickBank products, then you represent and warrant the following: ...

8.   If you register with ClickBank, then:

-   You agree that ClickBank may list your product in its catalog and make it available for purchase by retail consumers.

-   You understand that ClickBank may adjust the final retail price (including any applicable sales tax) of that product.

-   You understand that ClickBank may delist any product from its catalog at any time, without cause or notice.

Arguably these terms suggest not only the "assistance" Keynetics renders to its affiliates; they arguably evidence control amounting to agency (an element of particular relevance to the jurisdictional issue to be discussed) or even a conspiratorial relationship.

As for Mulligan, the Amended Complaint alleges that he promotes ClickBank "as a product market place and a payment mechanism" which has over 40,000 products available and is a "major source of [his] traffic." He highlights the interaction between CBmall and ClickBank. CBmall's website contains, among others, the following promotions to would-be affiliates:

> "CBmall's search engine provides complete, accurate results of the entire ClickBank Marketplace and CBmall's security model works with ClickBank's to provide state of the art protection for ClickBank affiliates"

> \* \* \*

> "CBmall lets you make autopilot money in all the digital Info Products in the ClickBank Marketplace."

> \* \* \*

> "**the hard work is already done. I did it for you**. You don't have to learn, write, create, upload, download or any of that techier stuff ... you just do one thing: tell people about CBmall. CBmall does all the rest."

> \* \* \*

"Your commission for the products listed on the mall and on the search engine are paid every two weeks by ClickBank."

\* \* \*

"... it's a lot of work to run an autoresponder, buy the software, write all the articles, set up product links, handle e-mail questions, etc. **CBmall completely automates the process for you**"

\* \* \*

"**Personal e-mail marketing consultation with CBmall owner Jeff Mulligan**. You'll get a special, priority e-mail address to use for CBmall marketing questions.... Wondering how to promote CBmall effectively? Want to know what works and what doesn't before you spend the marketing dollars?"

\* \* \*

What can we do with e-mail consultation:

•   Review any type of copy. I've [Jeff Mulligan] been Sr VP of an ad agency and VP marketing for two software companies.... I've written a lot of copy and I can put that experience to work for you.

•   Evaluate advertising and promotional opportunities you are considering....

•   Devise ways to target specific mall items or categories.

(Emphasis in original).

As with Keynetics, the foregoing is arguably suggestive not only of "assistance" by Mulligan to CBmall's affiliates, but a degree of control that might amount to agency and possibly a conspiratorial relationship.

The Court thus agrees with BSI that Defendants are mixing proof with pleading. The who, what, when, where, and how of its claim have been fairly delineated in the Amended Complaint. For pleading purposes, the allegations of conspiracy in the initiation of and assistance in the transmission of false and misleading e-mail messages are plain enough. BSI is not required at this stage to marshal evidence to rebut Defendants' affidavits and to defeat their claims that they did not conspire or render assistance to each other or to their affiliates or that they in no manner agreed to the sending of unlawful e-mails.

The Court is satisfied that Defendants are fairly on notice of the claim BSI is making.

The Court finds the allegations of the Amended Complaint sufficient to meet the notice pleading allowed by the Federal Rules. [20]

---

[20]

As indicated, both Keynetics and Mulligan argue that, because in the Amended Complaint BSI has attached and referred to certain documents generated by them, BSI is bound by all averments in those documents. The implication of this is that such averments as Defendants not conducting any business in the State of Maryland, targeting Maryland customers, or the like stand unrebutted and therefore BSI has argued itself out of court. Keynetics in particular suggests that BSI has adopted *en toto* the affidavit of Stephen Rouse, a Keynetics official

The Court rejects this argument.

XI.

The law relative to the exercise of personal jurisdiction over a non-resident defendant by a federal court in Maryland is well-established.

A)   Jurisdiction must be authorized by Maryland's long-arm statute and its exercise must comport with due process requirements.  *Carefirst of Md. Inc.*, 334 F.3d at 396.  In Maryland, the statutory inquiry merges with the due process inquiry.  *Id.* at 396-97.  Due process is satisfied if the non-resident defendant has "minimum contacts" with the State such that requiring it to defend its interests here would not "offend traditional notions of fair play and substantial justice."  *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

For purposes of general jurisdiction, *i.e.* jurisdiction based on contacts which are not also the basis for the suit, the defendant's activities in the state must have been "continuous and systematic."  *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 711-12 (4th Cir. 2002), *cert. denied*, 537 U.S. 1105 (2003).

---

With respect to the affidavit, BSI clearly has not adopted it *en toto*, but has simply referred to one paragraph in it.  Second, while there may be some statements in the documents incorporated by reference into the Amended Complaint, the very same documents also contain information supportive of BSI's claim of agency relationships among and between Defendants.  BSI is no more bound by those portions of the documents that may be favorable to Defendants than a litigant would be bound to accept all the testimony an adverse witness might give at trial.

For present purposes, the issue is whether BSI has articulated a colorable claim against Defendants.  Whether BSI can ultimately prevail on the merits in the face of certain disavowals by Defendants is a matter to be determined at trial.

Specific jurisdiction, *i.e.* where defendant's contacts with the state form the basis of the suit, requires a less stringent showing.  *Id.*  Since BSI does not appear to assert general jurisdiction over Defendants in this case, and since in any event this suit is premised on Defendants' alleged contacts with the State, the Court considers only the matter of specific jurisdiction.

In that respect, the Court is obliged to look at (1) the extent to which Defendants purposefully availed themselves of the privilege of conducting activities in the State; (2) whether Plaintiff's claims arise out of those activities directed at the state and (3) whether the exercise of personal jurisdiction would be constitutionally "reasonable."  *Id.* at 712.

Maryland's long-arm statute provides, *inter alia*, that personal jurisdiction lies "over a person, who directly or by an agent . . . .  (c)auses tortious injury in the State by an act or omission in the State. . . ."  Md. Code Ann., Cts. & Jud. Proc. § 6-103(b)(3) (LexisNexis 2002). The statute applies to "computer information" in the same manner as it applies to goods and services." § 6-103(c)(2).  "Computer information" refers to "information in electronic form which is obtained from or through the use of a computer or which is in a form capable of being processes by a computer."  Md. Code Ann., Com. Law § 22-102(a)(10) (LexisNexis 2002).

B)    BSI alleges that it received several thousand unsolicited, false and misleading commercial e-mail messages which, on account of MCEMA, occasioned tortious injury in this State.  Keynetics concedes that the senders of the e-mails would be properly subject to personal jurisdiction here.  *See MaryCLE*, 2006 WL 173659. *See also Verizon Online Servs., Inc. v. Ralsky*, 203 F. Supp. 2d 601, 610 (E.D. Va. 2002).  It must also concede, given the language in Section 6-103 of the Courts and Judicial Proceedings Article that, insofar as the senders were acting as agents, their principal would also subject to such jurisdiction.  Keynetics, as well as Mulligan, deny that they have sent any of the subject e-mails either directly or by agent.

Keynetics argues that the independent acts of third parties cannot be attributed to ClickBank for jurisdictional purposes, citing for example *United Cutlery Corp. v. NFZ, Inc.*, 03-1723, 2003 WL 22851946 at *4-*5 (D. Md. Dec. 1, 2003). Once again it stresses that it does not advertise via unsolicited e-mail nor does it allow its vendors or affiliates to do so; that it has no knowledge of BSI and to its knowledge has never sent any e-mails to BSI or its affiliates; that ClickBank has a zero tolerance policy as far as unsolicited commercial e-mail by its clients is concerned; that, as a condition of using ClickBank's services, its vendors and affiliates specifically agree not to send any unsolicited commercial e-mail; that ClickBank reserves the right to seize client funds and/or terminate a client's account for violating this rule and that it

has done so in several occasions; and that ClickBank has no direct control over its vendors and affiliates – they are independent entities, neither agents or employees of ClickBank.

For his part, Mulligan contends that to exercise personal jurisdiction over him would be constitutionally unreasonable. CBmall, he says, is a legitimate business conducted over the Internet which has not purposefully directed any activity into Maryland. His contacts with the State of Maryland have been insufficient to confer personal jurisdiction. "Requiring a New Hampshire resident to defend this Maryland lawsuit which is based solely on a presence on the Internet, would be contrary to due process and would offend the traditional notions of fair play and substantial justice."

This much is clear: "[A] State may, consistent with due process, exercise judicial power over a person outside of the State when that person (1) directs electronic activity into the State, (2) with the manifested intent of engaging in business or other interactions within the State, and (3) that activity creates, in a person within the State, a potential cause of action cognizable in the State's courts." *ALS Scan*, 293 F.3d at 714 (citing *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119 (W.D. Pa. 1997)). *See also MaryCLE*, 2006 WL 173659, at *7 n.20. Accordingly, the core issue is whether Defendants in some material way "directed" the allegedly offensive e-mail messages into this State, either on its own or by agent; otherwise, given the

obvious unsolicited nature of the requests that Marylanders make purchases through

the Internet, [21] it is clear that the senders manifested an intent to do business here and,

to the extent that their messages are found to be false or misleading, that they created

in a person within the State a potential cause of action under Maryland law.  *See*

*generally id.*

The Court accepts that BSI has not made a *prima facie* showing that

Defendants themselves directly crafted any of the challenged e-mails.  The issue made

relevant by MCEMA, however, is whether BSI has made a sufficient showing of

---

[21]

        The Fourth Circuit has adopted a "sliding scale" for the exercise of personal jurisdiction based on Internet contacts.  The court's *ALS Scan* decision expressly:

> "[a]dopt[ed] and adapt[ed]" the model for Internet-based specific jurisdiction developed in *Zippo Manufacturing Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119 (W.D. Pa. 1997).  *Id.* at 714. . . .When a defendant runs an interactive site, through which he "enters into contracts with residents of a foreign jurisdiction that involve the knowing and repeated transmission of computer files over the Internet," he can properly be haled into the courts of that foreign jurisdiction. *Zippo*, 952 F. Supp. at 1124.If, by contrast, the defendant's site is passive, in that it merely makes information available, the site cannot render him subject to specific personal jurisdiction in a foreign court. *Id.*; *see Mink v. AAAA Dev. LLC*, 190 F.3d 333, 336 (5th Cir. 1999); *see also ESAB Group, Inc. v. Centricut, LLC*, 34 F. Supp. 2d 323, 330 (D.S.C. 1999).  Occupying a middle ground are semi-interactive websites, through which there have not occurred a high volume of transactions between the defendant and residents of the foreign jurisdiction, yet which do enable users to exchange information with the host computer.  "In these cases, the exercise of jurisdiction is determined by examining the level of interactivity and commercial nature of the exchange of information that occurs." *Zippo*, 952 F.Supp. at 1124.

*Carefirst of Md.*, 334 F.3d at 399.

possible agency relationships between and among Keynetics and Mulligan, on the one hand, and their affiliates – the supposed senders of the offending messages – on the other.

BSI, as it happens, has contributed to recent case law in this regard.  In *Beyond Systems, Inc. v. Realtime Gaming Holding Co.*, 388 Md. 1, 878 A.2d 567 (2005), it brought an anti-spam suit against two non-resident entities under MCEMA, which reached the Maryland Court of Appeals.

The central issue was whether the defendants possessed the requisite minimum contacts to show that they had purposefully availed themselves of the benefits of conducting business in Maryland.  Realtime Gaming, a limited liability company formed under the laws of Delaware, was the holding company for KDMS, a limited liability company formed under the laws of Georgia.  Both entities had their principal places of business in Georgia.  KDMS developed interactive proprietary software that Realtime Gaming marketed and sold.  Realtime Gaming entered into an exclusive licensing agreement with Montana Overseas, a Panamanian corporation, which in turn licensed the use of the KDMS software to windowscasino.com, an interactive online casino owned by ADLM Ltd., which was based in the United Kingdom.

Windowscasino.com advertised for "affiliates," who, for a small investment could make money by referring players to windowscasino.com's website. Travis Thom, a resident of New Mexico, became an affiliate and created a name for his affiliate webpage, www.goldenrhinocasino.com. Windowscasino.com then designed a webpage for Thom, which included his input as to aesthetics but not as to content or function. Thom's webpage directed players to the windowscasino.com website where players could download the software designed by KDMS, which was retrieved from an IP address (Internet Protocol Address) registered to KDMS. Thom was compensated by windowscasino.com based on his referrals. Thom thereafter contracted with a bulk e-mail solicitation service to send 2.5 million unsolicited e-mail advertisements, having paid windowscasino.com a fee to write and design the e-mails. Eventually a total of 240 such e-mails advertising the Golden Rhino Casino were received by BSI at various addresses in Maryland.

BSI sued Realtime Gaming, KDMS, and an unknown co-defendant in Montgomery County Circuit Court. The defendants moved to dismiss for lack of personal jurisdiction, affirming by affidavit that they conducted no business in Maryland. BSI, by affidavit of its owner Paul Wagner (also its affiant here), asserted what the Court of Appeals eventually characterized as "various conclusory statements

concerning the existence of an agency relationship between Realtime Gaming, KDMS, and windowscasino.com."  388 Md. at 8, 878 A.2d at 571.

The trial court dismissed the complaint for lack of jurisdiction and denied BSI's request to take discovery of jurisdictional facts.

On appeal, the Maryland Court of Appeals affirmed.  The court held that for personal jurisdiction to exist over Realtime Gaming and KDMS,  "BSI must make a *prima facie* showing that an agency or contractual relationship exists between Realtime Gaming and KDMS and windowscasino.com,"  *Id.* at 26, 878 A.2d at 582, by which it meant a showing of:

1)     The agent's power to alter the legal relations of the principal;

2)     The agent's duty to act primarily for the benefit of the principal; and

3)     The principal's right to control the agent.

*Id.* at 27, 878 A.2d at 583.

In the case before it, said the court:

(t)he only evidence of any kind of relationship between Realtime Gaming and KDMS and windowscasino.com is the fact that windowscasino.com contains a link to an IP address registered to KDMS where customers can download the gaming software.  This does not establish or even indicate a relationship, principal-agent or contractual, between Realtime Gaming and KDMS, on the one hand, and windowscasino.com   on   the   other   in   which

> windowscasino.com is empowered to act on Realtime
> Gaming and KDMS's behalf or whether Realtime Gaming
> and KDMS control windowscasino.com.  BSI does not
> provide any evidence of mutual corporate officers, board
> members, owners, or other such controlling individuals or
> entities    to    show    anything    more    than    that
> windowscasino.com has obtained a sub-license from
> Montana Overseas.  A mere link with no more compelling
> evidence is insufficient to create the necessary nexus
> between    Realtime    Gaming    and    KDMS,    and
> windowscasino.com and Thom.

*Id.*

In consequence, the court found that the defendants had insufficient contacts with Maryland and insufficient connection with the conduct in question as would pass constitutional muster.  It also upheld the trial judge's denial of BSI's request for discovery, declaring simply that the decision was not "beyond the decision that a reasonable person would make in light of the fact that BSI was unable to produce <u>any</u> evidence of a connection between Realtime Gaming and KDMS, on the one hand, and windowscasino.com and Thom, on the other hand," except as indicated. *Id.* at 28, 878 A.2d at 584 (Emphasis in original).

Comparing *Realtime Gaming* with the present case, the differences stand forth in bold relief.  Here the affiliates – the supposed senders of the offensive e-mails – are conceded to have been direct affiliates of either or both Defendants, not affiliates of a non-defendant third party.  Here all the affiliates are conceded to have had

contracts directly with Defendants.  Here all the affiliates have signed on either to steer customers directly to Keynetics (ClickBank) or to do so through Mulligan's websites.  Here all the affiliates counted on ClickBank to actually market products, to bill the customers, arrange for the delivery of the products, and remit to the affiliates their commissions.  In marked contrast, at least from what appears in the Court of Appeals opinion, Realtime Gaming and KDMS maintained essentially passive websites.  Little if anything was known of the actual extent of their roles, if any, in the administration of windowscasino.com's affiliate commission system.  Here, as indicated, a great deal is known about the manner in which Keynetics related to its affiliates and to Mulligan and his affiliates. [22]

To be sure, both Keynetics and Mulligan may have sought to expressly disavow the existence of an agency relationship as to one another and as them and their affiliates and in particular they may have attempted to disassociate themselves from any spam activities of their affiliates.  But express disavowals of agency do not *ipso facto* establish its non-existence.  As the Florida Supreme Court noted in *Villazon v. Prudential Health Care Plan, Inc.*:

---

[22]      The present case stands somewhere between *Realtime Gaming* and *MaryCLE*.  In the former, the non-resident defendants were not the senders of the allegedly offensive e-mails and plaintiff could establish no agency or other contractual relationship between defendants and the sender.  In *MaryCLE*, defendant was said to be the sender.  In the present case, Defendants are alleged to be principals of the agent-senders or to have otherwise assisted the senders or conspired with them in the initiation and transmission of the e-mails.

> It is not uncommon for parties to include conclusory statements in documents with regard to the independence of the relationship of the parties. This may occur even when other contractual provisions and the totality of the circumstances reflect otherwise. Such a situation has caused this court to reason:
>
> While the obvious purpose to be accomplished by this document was to evince an independent contractor status, such status depends not on the statements of the parties but upon all the circumstances of their dealings with each other.

843 So.2d 842, 853-54 (Fla. 2003).

Nor can a principal automatically escape liability for the tortious acts of its agent committed in the course of its employment, even if the principal did not authorize or know of the acts complained of, *see, e.g.*, *Meyer v. Holley*, 537 U.S. 280, 286 (2003), and even if the principal expressly forbade or disapproved of the act. *See, e.g.*, *Savelle v. Armstrong*, 908 So.2d 265, 267-68 (Ala. Civ. App. 2004).

For present purposes, the Court assumes without deciding that BSI has not made a sufficient showing of an agency relationship between and among Keynetics and Mulligan and their affiliates. But apart from the fact that that is an issue which is very much "intertwined" with the merits of the case which could quite appropriately be deferred until trial on the merits, *Data Disc., Inc.*, 557 F.2d at 1285, the more relevant issue, given what BSI has demonstrated so far, is whether it has

made a showing as would justify permitting it to take further discovery on jurisdictional facts before the Court rules.  The Court believes that it has.

In this respect, the three dissenters of the seven member Maryland Court of Appeals in *Realtime Gaming*, who would have reversed the trial court's denial of discovery of jurisdictional facts, made some observations of particular relevance to the case at bar.

<div align="center">XII.</div>

Citing the general rule that a court should not dismiss a claim for lack of personal jurisdiction without permitting the plaintiff to obtain discovery as to jurisdictional facts, 388 Md. at 30, 878 A.2d at 585 (citing *Androutsos v. Fairfax Hospital*, 323 Md. 634, 594 A.2d 574 (1991)), the dissenters in *Realtime Gaming* expressed concern about the particular problems posed by spammers over the Internet:

> The elusive nature of Internet presence, together with strong incentives for "spammers" to conceal their identities, portends that often there will be a dearth of jurisdictional facts in future cases brought under the Commercial Electronic Mail statute.  The General Assembly has created a private cause of action to aid Maryland residents in the escalating battle against unsolicited, deceptive commercial e-mail.  The effectiveness of that tool will be diminished if we close the courthouse door to plaintiffs without providing them the means to uncover facts that would support personal jurisdiction.

388 Md. at 34, 878 A.2d at 587.

The dissenters then referred to three facts established by BSI which they suggested cast doubt on the defendants' contention that the sender was at most a sub-licensee of KDMS software which had no agency relationship with KDMS and Realtime Gaming.  First, they cited the hyperlink to windowscasino.com that permitted Maryland residents to download the KDMS-designed software; second, they cited the fact that the domain name of windowscasino.com corresponded to an IP address registered to KDMS and Realtime Gaming; and, third, they referred to the suggestion of BSI's expert Paul A. Wagner that a portion of the hyperlink might serve to identify the affiliate (*i.e.* the sender of the e-mail) who recruited the customer (*i.e.* the gambler).  *Id.* at 35, 878 A.2d at 587. "Assuming this (latter) uncontroverted allegation to be true, a KDMS-owned server was collecting information that could have been used to determine Travis Thom's compensation." *Id.*

The dissenters characterized the relationship between the defendants and windowscasino.com, the nonparty, as one "shrouded in the mists of holding companies, off shore entities, and multi-level licensing arrangements." *Id.*  They posed  a series of questions regarding the possible connections among and between the various entities. Who owned them? Did the companies have assets or employees? How were the licensing fee arrangements arranged?  What aspects of the sender's business, if any, were actually run directly by defendants?  What hand, if any, did the

defendants have in writing advertising copy for the senders? *Id.* at 36, 878 A.2d at 588.

While the dissenters felt that the answers to such questions might well establish that the defendants could in no way be deemed to have purposefully "sent" Thom's e-mails into Maryland, they also believed that they might establish that the advertisement and the strategy for e-mailing it in bulk were the direct creations of the defendants, "hiding behind multiple layers of dummy corporations and sham licensees in an attempt to disguise their operation of a "spam"-dependent business." *Id.* In contrast to this well-reasoned dissent, the four member majority of the court simply declared that the trial court did not err in denying discovery as to jurisdictional facts because Beyond Systems failed to present "any evidence" demonstrating a relationship between the defendants.

Accepting for the sake of argument the rationale of the *Realtime Gaming* majority regarding BSI's non-entitlement to discovery of jurisdictional facts, it is clear that the facts in the present case are far more indicative of a possible agency relationship between Defendants and their unsued affiliates than they were in *Realtime Gaming*. As noted several times, ClickBank had direct contact with its own affiliates as well as with those of Mulligan, while Mulligan had direct links with ClickBank and with his own affiliates. All the customers recruited by the affiliates were routed to

ClickBank's website where they shopped and had their orders filled.  All affiliates maintained accounts with Keynetics which paid the affiliates for referrals.  Clearly Keynetics knew who those affiliates were and may very well have had some notion of the e-mails they were sending out; indeed Keynetics may have had a hand in designing the e-mails.  The same is true as to Mulligan.  And while it is not clear to what extent, if at all, Mulligan received compensation from Keynetics, it is hard to imagine that he did not receive some form of remuneration for his overall services.

In any event, in discussing the three factors relevant to the determination of a "principal-agent or contractual" relationship that might justify the exercise of personal jurisdiction over the defendants, the *Realtime Gaming* majority pointed out that "[t]he three factors are evaluated within the totality of the circumstances . . . [and] the presence of all three factors is not required for a finding of an agency relationship."  388 Md. at 27, 878 A.2d at 582.  On that basis, BSI may well qualify for a jurisdictional pass.  Here, ironically enough, Keynetics' very attempt to control its affiliates by banning the use of bulk mail, among other restrictions it imposes, implies control which in turn is suggestive of a principal's control of an agent.  As for the power to alter legal relations of the principal, while a Keynetics affiliate may not be able to bind it to the sale of a given product or products, the affiliate arguably functions in a way little different from the way an employee/salesman does when he

takes orders from customers subject to home office approval.  As for the duty to act primarily for the benefit of the principal, which means only that a putative agent may not put himself in a position where his own interests might conflict with those of his principal, *Maryland Credit Finance Corp. v. Hagerty*, 216 Md. 83, 139 A.2d 230 (1958), this may simply be one of the factors which, as the *Realtime Gaming* majority noted, does not need to be present for an agency relationship to exist between Defendants and their affiliates.

The one nonparty affiliate identified in *Realtime Gaming*, Travis Thom -- the alleged spammer -- was an affiliate of windowscasino.com, which was also a nonparty in that case.  Here the affiliates -- the alleged spammers -- were direct affiliates of Defendants.  And here, emphatically, the inquiry is not whether BSI has fully and finally established the agency relationships in this case – but whether its request for discovery regarding this ultimate issue is something more than a "fishing expedition."  The dissenters in *Realtime Gaming* thought BSI's request for discovery was not simply a fishing expedition in that case.  On stronger facts, this Court believes it is not simply that in this case.

Accordingly, the Court will DENY WITHOUT PREJUDICE the Motions to Dismiss of Defendants Keynetics and Mulligan.

BSI's Motion for Leave to File Discovery Requests as to Personal Jurisdiction will be GRANTED as to Defendants' Keynetics and Mulligan and DENIED as to Defendants Rackspace and Macro Holding.

For reasons stated earlier, the Court will GRANT the Motion to Dismiss as to Defendants Rackspace and Macro Holding.

A separate Order implementing this decision will be entered.


_____ **/s/**
                                 **PETER J. MESSITTE**
February 14, 2006                **UNITED STATES DISTRICT JUDGE**